**Robert ROSEBROCK, an
individual, Plaintiff,**

v.

**Donna BEITER, Director of the Veterans Administration Greater Los Angeles Healthcare System, in her official capacity; Ronald Mathis, Chief of Police of the Veterans Administration Greater Los Angeles Healthcare System, in his official capacity, Defendants.**

**No. CV 10–01878 SJO (SSx).**

United States District Court,
C.D. California.

May 26, 2011.

Hector O. Villagra, Jessica G. Price, Peter J. Eliasberg, ACLU Foundation of Southern California, Silvia Araxie Babiki-

an, American Civil Liberties, Union of Southern California, Los Angeles, CA, for Plaintiff.

Indira J. Cameron–Banks, Office of U.S. Attorney, Los Angeles, CA, for Defendants.

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Docket No. 32]; DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Docket No. 37]

S. JAMES OTERO, District Judge.

This matter is before the Court on Defendants Donna Beiter and Ronald Mathis (collectively, "Defendants") and Plaintiff Robert Rosebrock's ("Plaintiff") separate Motions for Summary Judgment, filed on October 18, 2010 and October 25, 2010, respectively. (Docket Nos. 32, 37.) Plaintiff submitted an Opposition to Defendants' Motion on November 1, 2010.[1] Defendants submitted an Opposition to Plaintiff's Motion on the same date. The parties filed their respective Replies on November 8, 2010.[2] Both of the parties filed Evidentiary Objections. Defendants also submitted a Statement of Genuine Issues of Disputed Facts, while Plaintiff

declined to do so.[3] The Court found these matters suitable for disposition without oral argument and vacated the hearings set for November 15, 2010. See Fed. R.Civ.P. 78(b). Plaintiff submitted a Supplement to his Motion on December 20, 2010. (Docket No. 55.) For the following reasons, Defendants' and Plaintiff's Motions for Summary Judgment are GRANTED IN PART AND DENIED IN PART.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The United States Department of Veterans Affairs ("VA") is a federal agency charged with administering "the laws providing benefits and other services to veterans and the dependents and the beneficiaries of veterans." 38 U.S.C. § 301 (2006); (see also Decl. of Lynn Carrier ("Carrier Decl.") in Supp. of Defs.' Mot. ¶ 2.) The VA Greater Los Angeles Healthcare System (the "VAGLA") is one of the largest and most complex VA health care systems in the country. (Carrier Decl. ¶ 2.) Its mission is to provide high quality health care services to eligible veterans throughout the Los Angeles region. (Id.) The VAGLA provides the most comprehensive homelessness program within the agency to address the needs of veterans, including

---

1. Defendants filed a "Notice of Non–Receipt of Opposition to Federal Defendants' Motion for Summary Judgment" on October 27, 2010. Defendants requested the Court to "take appropriate action pursuant to Local Rule 7–12." (Notice of Non–Receipt 3:1–2.) Plaintiff filed an Opposition to Defendants' Notice of Non-receipt on November 29, 2010, stating that it believed the deadline was November 1, 2010. The Court granted leave for Plaintiff to file his Opposition by November 1, 2010.

2. Defendants filed a Reply that was twelve pages long. The Court's Initial Standing Order mandates that "[n]o reply may exceed five pages." (Standing Order ¶ 19.) Because De-

fendants failed to comply with the Initial Standing Order, the Court declines to read Defendants' Reply after the fifth page. The parties are on notice that the Initial Standing Order should be followed.

3. The Court rules on Defendants' and Plaintiff's Evidentiary Objections in a separate Order that will issue concurrently with this Order. Defendants' and Plaintiff's Evidentiary Objections are OVERRULED IN PART AND SUSTAINED IN PART. The Court also finds that Defendants do not present any genuine issues of disputed facts to preclude the Court from entering summary judgment.

a domiciliary that houses approximately 250 veterans. (Decl. of Ralph D. Tillman in Supp. of Defs.' Reply ("Tillman Decl.") ¶ 4.) While the VAGLA has numerous locations throughout the region, its West Los Angeles campus (the "VAGLA Campus") is the only location where complex medical, surgical, and psychiatric care is offered. (Carrier Decl. ¶ 2.) The VAGLA Campus cares and treats homeless veterans, veterans who have recently returned from combat, and those suffering serious psychiatric conditions such as post traumatic stress disorder. (Tillman Decl. ¶ 3.) Pursuant to sharing agreements, non-healthcare related events are held on the VAGLA Campus on certain occasions, but revenues from those events are deposited directly into funds that maintain and improve the property. (Id. ¶ 4.)

The VAGLA Campus contains a large grass lawn, called the "Great Lawn." (See Rosebrock Decl. ¶ 3.) The Great Lawn has a perimeter fence around it (the "Perimeter Fence"). (Id.; Carrier Decl. ¶ 5.) A gate that leads into the Great Lawn (the "Gate") is located at the intersection of San Vicente and Wilshire Boulevards in Los Angeles. (Rosebrock Decl. ¶ 3; Carrier Decl. ¶ 5.) Directly in front of the Gate is approximately 50–75 feet of VA property separated from the public sidewalk by low, widely spaced concrete barriers (the "Entrance Area"). (Carrier Decl. ¶ 5; Rosebrock Decl. ¶ 3.) The Entrance Area is also demarcated from the public sidewalk by color; it is a darker gray. (Rosebrock Decl. Ex. 1; Carrier Decl. Ex. 1.)

Plaintiff is a 68–year–old Vietnam War-era veteran. (Rosebrock Decl. ¶ 2.) Age has neither mellowed him nor dissipated his passion. He and a number of fellow veterans have been demonstrating in the Entrance Area and the public sidewalk every Sunday since March 9, 2008. (Id.) Plaintiff protests the VA's refusal to devel-

op the Great Lawn into a shelter for homeless veterans or to use the land for the benefit of veterans. (Id. ¶ 5.) Plaintiff objects to what he perceives to be a pattern of transferring portions of the VAGLA Campus to other entities for use unrelated to the care and shelter of veterans. (Id. ¶¶ 6, 7.) The protests last on average around three to four hours. (Id. ¶ 8.)

On March 9, 2008, Plaintiff and his fellow protestors began their regular Sunday demonstrations. (Rosebrock Decl. ¶¶ 5, 8.) During Plaintiff's first demonstration, Sergeant Nathaniel Webb ("Webb"), a VA police officer, expressly stated to Plaintiff that "his group would be prohibited from hanging any signs, placards or flags from the VA fence or on VA property." (Dep. Nathaniel Webb ("Webb Dep.") 7:5–8, 53:14–18, 54:12–15, 55:25–56:6.) Webb, however, explained that Plaintiff could hang "flags of the United States of America or prisoner of war." (Id. at 53:18–19.) Plaintiff responded that he understood and would comply. (Id. at 53:22–23.) Prior to the demonstration, Jim Duvall ("Duvall"), a Senior Manager for the Public Affairs Department of the VAGLA, had communicated to Webb that Plaintiff would be protesting. (Id. at 55:5–10.) Duvall instructed Webb to let Plaintiff "be on that area of the VA property that was designated at the [intersection of] Wilshire and San Vicente [Boulevards], but ... [to] prohibit[ ] [Plaintiff] from hanging any signs or placards on VA fence line." (Id. at 57:4–9.) "The only exception[s] ... [to the prohibition were] the flag of the United States of America and the POW flag." (Id. at 57:9–11.)

During their subsequent protests, Plaintiff and other demonstrators hung the United States flag, union up, and P.O.W./ M.I.A. banners on the Gate and Perimeter Fence. (Rosebrock Decl. ¶ 10.) They displayed the American flag to show patrio-

tism, even while disagreeing with the VAGLA. (*Id.* ¶ 9.) Plaintiff also hung a "Support Our Troops" banner and a Vietnam Unit flag on certain occasions. (*Id.* ¶¶ 11–12.) On some Sundays, the demonstrators hung as many as 30 United States flags on the fences surrounding the Great Lawn. (*Id.* ¶ 19, Ex. 5.) The protestors also held the United States flag, union down, during the protests to send out a "distress call" and to bring attention to the perceived gross injustice of the VAGLA's land use policy. (Decl. of Indira J. Cameron–Banks in Supp. of Defs.' Opp'n ("Cameron–Banks Decl.") Ex. 10.) From March 9, 2008, to November 30, 2008, the VA police made no contact with the demonstrators to express disapproval or to prohibit the display of the United States flag or the P.O.W./M.I.A. flag on the Perimeter Fence. (Rosebrock Decl. ¶ 10.)

On or about November 30, 2008, Webb approached Plaintiff during a demonstration and ordered him to remove a "Support Our Troops" banner and a Vietnam Unit flag. (Rosebrock ¶ 10; Webb Dep. 67:4–15.) Webb informed Plaintiff that he was in violation of 38 C.F.R. section 1.218(b)(22)[4] ("section 1.218") for hanging the banner and flag on VA property. (Webb Dep. 67:4–15.) Webb permitted Plaintiff to display the United States flag, right-side up, and the P.O.W./M.I.A. flag on the Perimeter Fence. (Rosebrock ¶ 10.) Plaintiff and his fellow demonstrators removed the Support Our Troops banner and the Vietnam Unit flag. (*Id.*)

After the November 30, 2008 incident, Plaintiff sent a letter to the VA, reporting that he and his demonstrators believed Webb harassed them and suppressed their speech. (Carrier Decl. Ex. 2.) As a follow up to that letter, Bob Handy ("Handy")—a veteran, chair of the Veterans Caucus for the California Democratic Party, and a fellow demonstrator—e-mailed the VA Chief of Staff Colonel Thomas Bowman to request that he be provided:

> ALL GOVERNMENT, [sic] CODES OR OTHER LAWS THAT REGULATE PUBLIC DISPLAYS ON OR NEARS [sic] VETERANS['] HOMES, additionally those codes, rules or other restrictions concerning the requirements of temporar[il]y attaching signs, banners or other material specifically on the fencing, walls, or other barriers to veterans['] homes.

(*Id.*) After several e-mail communications back and forth, including an e-mail sent by Handy to the Secretary of Veterans' Affairs Erick Shinseki, Handy received an answer from Lynn Carrier ("Carrier"), Associate Director of the VAGLA. (*Id.*) On February 6, 2009, Carrier pointed Handy to section 1.218 and explained that, "[c]onsistent with [the] regulation, [the VAGLA does] not allow displays of placards or other material on the perimeter fencing of the property." (*Id.*)

On June 14, 2009, Plaintiff began to hang the United States flag with the union down on the Perimeter Fence. (Rosebrock Decl. ¶ 14.) Plaintiff asserts that he grew increasingly frustrated with the VAGLA for not developing the Great Lawn for the shelter and care of homeless veterans. (*Id.*) He hung the American flag inverted to express a different message, not of patriotism or support for military veterans, but as a distress call. (*Id.* ¶ 15.) Defendants assert that several complaints were lodged with the VAGLA by patients regarding Plaintiff's display of an inverted

---

**4.** Under 38 C.F.R. section 1.218(b), a schedule of offenses and penalties is listed. Specifically, section 1.218(b)(22) sets a $25 penalty for violating section 1.218(a)(9), which prohibits "the displaying of placards or postings of materials on bulletin boards or elsewhere on [VA] property." 38 C.F.R. § 1.218(a)(9).

American flag on the Perimeter Fence. (Carrier Decl. ¶ 12.) On two separate occasions, Plaintiff was threatened with physical violence. (*Id.*, Exs. 3–4.) Then, on June 26, 2009, Carrier sent an e-mail to Plaintiff to inform him that he "may not attach the American flag, upside down, on VA property, including [the] perimeter gates." (*Id.* Ex. 7.) She explained that hanging the United States flag, union down, "is considered a desecration of the flag and is not allowed on VA property." (*Id.*)

On June 30, 2010, Carrier issued an e-mail directive to the VA police department that VA police officers were required to enforce section 1.218 "precisely and consistently." (Carrier Decl. Ex. 8.) She asked that no outside pamphlets, handbills, flyers, flags or banners, or other similar materials be posted anywhere on VA property, including the Perimeter Fence. (*Id.*) Specifically, Carrier asked that no flags in any position be displayed. (*Id.*) Carrier, however, stated that the regulation extended only to VA property and that demonstrations on the public sidewalk should not be interfered. (*Id.*) On July 24, 2009, Kathy Treadwell ("Treadwell"), Patrol Captain for the VA police, relayed the instructions to VA police officers that Plaintiff and his fellow demonstrators were not authorized to hang any items on the Perimeter Fence. (Decl. of Kathy Treadwell in Supp. of Defs.' Reply ("Treadwell Decl.") ¶ 2, Ex. 1.) Treadwell ordered VA officers "to not make contact with such individuals but instead to issue [a citation]." (*Id.* Ex. 1.) The citations were to be issued to Plaintiff and sent by certified mail. (*Id.* Ex. 1.) Treadmill instructed her officers as such because she felt Plaintiff and his demonstrators purposefully antagonize VA officers in an effort to engage them into confrontations. (*Id.* ¶ 3.) Plaintiff and his demonstrators capture photographs and videos of the VA officers and publicize the

altercations on the Internet. (*Id.*; Cameron–Banks Decl. Exs. 9–11.) In promulgating the instructions, she believed VA police officers, many of whom are veterans themselves, were reluctant to enforce section 1.218 strictly because of the potential publicity the enforcement would bring upon them. (Treadwell Decl. ¶ 3.) Plaintiff received a citation dated July 26, 2009, in the mail for "unauthorized demonstrations or service in a national cemetery or on other VA property." (Rosebrock Decl. ¶ 21, Ex. 7.) On July 26, 2009, Plaintiff had hung the United States flag, upside down, on the Perimeter Fence during a demonstration. (*Id.* ¶ 22.) Plaintiff received five additional citations under section 1.218(a)(9) in August and September of 2009. (*Id.*) Three of these citations mentioned that Plaintiff had hung the United States flag, union down. (*Id.*) The citations were subsequently dismissed by Assistant United States Attorney Sharon K. McCaslin. (*Id.* ¶ 23.) The VA police have not issued any citations to Plaintiff since the charges relating to the previous citations were dropped. (Carrier Decl. ¶ 14.)

On February 21, 2010, Plaintiff and his fellow demonstrators held their 100th demonstration. (Rosebrock Decl. ¶ 25.) During that specific demonstration, Plaintiff displayed the United States flag with the union up on the fence for approximately three hours in the presence of VA police. (*Id.* Ex. 9.) The VA police neither interfered with the display of the United States flag, right-side up, nor cited Plaintiff. (*Id.* ¶ 25.) A week later, Plaintiff hung the United States flag inverted on the Perimeter Fence. (*Id.* ¶ 26, Ex. 10.) Within two and one-half hours, the VA police demanded that the flag be removed. (*Id.*) When Plaintiff refused, the VA police removed the flag themselves. (*Id.* ¶ 28, Ex. 11.)

Plaintiff filed a Complaint against Defendants on March 16, 2010, alleging viola-

tions of the First Amendment and the Fourteenth Amendment. Within six days, Plaintiff filed a Motion for Preliminary Injunction. On June 30, 2010, the Court denied Plaintiff's Motion for Preliminary Injunction. Plaintiff filed a Notice of Appeal to the Ninth Circuit on July 15, 2010. The Court of Appeals affirmed the Court's denial. (Docket No. 53.)

## II. *LEGAL STANDARD*

### A. *Summary Adjudication*

Federal Rule of Civil Procedure ("Rule") 56(a) mandates that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir. 2000) (citations and quotations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact. *See Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. Rather, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's

case." *Id.* Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R.Civ.P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Further, "[o]nly disputes over facts that might affect the outcome of the suit ... will properly preclude the entry of summary judgment [and] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A court is required to draw all inferences in a light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## III. *DISCUSSION*

### A. *The First Amendment*

"Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and ... inflict great pain." *Snyder v. Phelps,* —— U.S. ——, 131 S.Ct. 1207, 1220, 179 L.Ed.2d 172 (2011). The freedom to use speech, as well as symbolic or expressive conduct, in such a manner without censorship or restriction from the Government is enshrined in the First Amendment, which provides that "Congress shall make no law ... abridging the

freedom of speech." U.S. Const. Amend. I; *see also Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ("The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."). "[T]he First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (quoting *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). It has oft been described as an expression of "the most cherished" of our democratic ideals. *See United States v. Robel,* 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

■ The privileges afforded by the First Amendment, however, are not absolute. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *see also Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) ("The guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'"). Indeed, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 799, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The Government "has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

■ "In assessing a First Amendment claim relating to speech on government property, the first step is to identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 965 (9th Cir.2002) (citing *Cornelius,* 473 U.S. at 797, 105 S.Ct. 3439). Three separate categories of fora exist. *See Preminger v. Peake (Preminger II ),* 552 F.3d 757, 765 (9th Cir.2008). If the forum is public, such as streets and parks that traditionally have been devoted to expressive activity, "speakers can be excluded ... only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. The second category is composed of designated public for a—"public property which the state has opened for use by the public as a place for expressive activity." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In designated public fora, the Government is "bound by the same standards as appl[ied] in a traditional public forum." *Id.* at 46, 103 S.Ct. 948. In sharp contrast, "a more lenient standard applies" to nonpublic fora. *See Sammartano,* 303 F.3d at 965. The Government may restrict access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. Stated differently, "the [G]overnment violates the First Amendment when it denies access to a speaker solely to suppress the point of

view he espouses on an otherwise includible subject." *Id.*

### B. *The VAGLA Campus, Including Its Perimeter Fence, Is a Nonpublic Forum.*

The parties seemingly agree that the VAGLA Campus is a nonpublic forum. (Pl.'s Mot. 7:9–8:13 (applying the more lenient standard applicable to nonpublic fora); Defs.' Mot. 5:7–8.) The mission of the VAGLA is to provide quality health care services to eligible veterans, such as complex medical, surgical, and psychiatric care, not to provide space for public discourse. (*See* Carrier Decl. ¶ 2.) The VAGLA Campus, including its Perimeter Fence, cannot be described as a forum that traditionally has been devoted to expressive activity, such as a public street or park. *See Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439. Moreover, Plaintiff does not point to evidence in the record showing that the VAGLA Campus, including the Perimeter Fence, was affirmatively opened by the Government "as a place for expressive activity."[5] *See Perry Educ. Ass'n*, 460 U.S. at 45–46, 103 S.Ct. 948; *see also Center for Bio–Ethical Reform, Inc. v. City of Honolulu*, 455 F.3d 910, 919 (9th Cir.2006) ("Designated public fora are non-public fora that the government ***affirmatively opens*** to expressive activity.") (emphasis added). Though Plaintiff does not directly argue, he passingly provides testimony that he remembers signs being posted on the Perimeter Fence advertising local drama productions. (Rosebrock Decl. ¶ 4.) This evidence does not show that the posted signs were affirmatively permitted by the VAGLA, which would have turned the Perimeter Fence into a designated public forum. Without evidence that the VAGLA "intentionally designated" the Perimeter Fence "a place or means of communication as a public forum," the VAGLA Campus and the Perimeter Fence constitute a nonpublic forum. *See Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439.

In fact, the Ninth Circuit and several sister circuits have held that VA medical centers like the VAGLA Campus constitute nonpublic fora. *See Preminger v. Principi (Preminger I)*, 422 F.3d 815, 824 (9th Cir.2005) ("The purpose of [VA Medical Centers] is not to facilitate public discourse; to the contrary, the VA has established the facilit[ies] to provide for veterans who require long-term nursing care."); *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1313 (Fed.Cir. 2008) ("We agree with the government that VA Medical Centers, exemplified by the Menlo Park Medical Center, constitute nonpublic fora."); *United States v. Fentress*, 241 F.Supp.2d 526 (D.Md.2003) ("A VA hospital, however, is a nonpublic forum."). Applying Ninth Circuit precedent, the Court finds that the VAGLA Campus, including its Perimeter Fence, is a nonpublic forum.

---

**5.** The Court duly notes that "Plaintiff may have been authorized, either explicitly or implicitly" to display the American flag on the Perimeter Fence by Defendants. (Defs.' Reply 4:3–4.) "[T]he First Amendment allows the government to open [a] non-public forum for limited purposes." *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir.2007). The "limited public forum is a sub-category of a designated public forum that 'refer[s] to a type of non-public forum that the government has intentionally opened to certain groups or to certain topics.'" *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir.2001) (alteration in original). Thus, the Perimeter Fence may be categorized as a "limited public forum." This, however, does not change the Court's analysis. Though Defendants may have opened the Perimeter Fence, they are still permitted to exclude speech so long as the exclusion is reasonable in light of the purpose served by the forum and is not based on viewpoint. *See Flint*, 488 F.3d at 831.

Accordingly, neither the VAGLA Campus nor the Perimeter Fence upon which Plaintiff previously hung the United States flag is a public forum.

### C. Section 1.218(a)(9), Which Prohibits Posting of Materials on VA Property, Is Facially Reasonable in Light of the Mission of the VAGLA Campus and Is Viewpoint Neutral.

Plaintiff expressly states that he "is not challenging the VA regulations." (Pl.'s Mot. 1:16–17.) He "does not contend that 38 CFR [sic] § 1.218(a)(9) is viewpoint discriminatory." (Id. at 12:11–12.) In fact, Plaintiff begrudgingly admits that section 1.218(a)(9) "prevent[s] individuals from hanging anything on the perimeter fence surrounding [the VAGLA Campus]." (Id. at 12:9–12.) Plaintiff instead challenges Defendants' alleged "pattern of viewpoint discriminatory enforcement of the regulation." (Id. at 12:12–13; Pl.'s Opp'n 16:16–28.)

■ The VA Regulation at issue is section 1.218(a)(9), which provides that "the displaying of placards or posting of materials ... is prohibited, except as authorized by the head of the facility or designee or when such distributions or displays are concluded as part of authorized Government activities." 38 C.F.R. § 1.218(a)(9). Section 1.218(a)(9) is viewpoint neutral; it prevents any unauthorized speaker from posting any material, not just from one side of a debate. See id. The regulation also serves legitimate purposes. The restriction of expressive conduct "to avoid violating the trust of [the VAGLA Campus]'s patients" is a "reasonable" rationale. See Preminger II, 552 F.3d at 767. Moreover, permitting expressive conduct at the VAGLA Campus would divert limited resources to the supervision of the conduct, thereby compromising the VAGLA's ability to provide health care services to veter-

ans. See id. at 765. Plaintiff seemingly does not dispute the reasonableness and viewpoint neutrality of section 1.218(a)(9). (See generally Pl.'s Mot.; Pl.'s Opp'n.) Accordingly, as conceded by Plaintiff, section 1.218(a)(9) is reasonable and does not facially transgress the First Amendment.

### D. The Uneven Enforcement of Section 1.218(a)(9) Violated the First Amendment.

Plaintiff asserts that section 1.218(a)(9) has not been applied evenhandedly, and that the selective enforcement is unconstitutional viewpoint discrimination of Plaintiff's speech. (Pl.'s Mot. 11:5–13:22); see also Police Dep't v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("selective exclusions" from a forum is a violation of the First Amendment). Defendants counter that the VAGLA reasonably restricted Plaintiff's speech in a viewpoint neutral manner. (Defs.' Mot. 4:21–7:19.)

### 1. The VAGLA Possessed Reasonable Rationales for Prohibiting the Displaying of the United States Flag, Union Down.

■ As aforementioned, to determine whether exclusion of speech from a nonpublic forum is constitutionally permissible, the Court must examine two factors. See Preminger II, 552 F.3d at 765. The first factor is whether the exclusion was "reasonable in light of the purpose served by the forum." Cornelius, 473 U.S. at 806, 105 S.Ct. 3439. Defendants allege that, pursuant to Ninth Circuit precedent, the enforcement of section 1.218(a)(9) was reasonable because the speech was disruptive to the operations and mission of the VAGLA; specifically, Defendants assert that the flying of the American flag inverted was "upsetting patients and visitors" and causing "security threats." (Defs.' Mot. 6:4–6; Defs.' Opp'n 3:22–28.)

In *Preminger II,* 552 F.3d at 766, the Ninth Circuit held that a concern over disruptions and interference with patient care and a desire to retain patients' trust were reasonable rationales for restricting speech at a VA medical center. The plaintiffs sought to register veterans on VA property. *Id.* at 761–62. VA personnel and police officers barred the plaintiffs from registering voters pursuant to a VA regulation that prohibits partisan activities. *Id.* at 762; *see also* 38 C.F.R. § 1.218(a)(14)(ii). The defendants alleged that the restriction on the speech was reasonable in light of the purpose of the VA medical center. *Preminger II,* 552 F.3d at 766. The Ninth Circuit agreed. *Id.* The appellate court concluded that permitting plaintiffs to register voters "would invite requests from other[s]" and that "supervising numerous voter registration campaigns would ... divert[ ] resources vital to the residents' treatment." *Id.* Moreover, the Ninth Circuit held that permitting plaintiffs to register voters at the medical center "would give the appearance of favoring [one party] over other parties." *Id.* at 767. The court determined that this appearance, in turn, may lead the patients to distrust the VA and undermine its ability to care for the veterans. *Id.*

Here, Defendants' proffered rationales are similarly reasonable and legitimate in light of the purpose of the VAGLA Campus. As in *Preminger II,* 552 F.3d at 766, the primary mission of the VAGLA Campus is to provide high quality health care services to eligible veterans. (Carrier Decl. ¶ 2.) The act of flying the United States flag, union down, has already diverted limited, vital resources from the caring of veterans. (*Id.* ¶ 12.) On at least two occasions, Plaintiff was personally threatened by individuals who were offended by the display of the American flag with the union down. (*Id.* Exs. 3–4.) Rather than focus on the medical and psychological needs of veterans, some of whom served recently in Afghanistan and Iraq, the VAGLA has had to siphon attention and resources to supervise property and protestors. Further, allowing Plaintiff free use of the Perimeter Fence would force the VAGLA to similarly provide space for protesters on other contentious issues. Supervising the use of the Perimeter Fence and addressing security threats, as in *Preminger II,* would divert valuable attention and resources from the mission of the VAGLA Campus.

The VAGLA also has a legitimate concern that the hanging of the United States flag, union down, undermines patients' trust in the VAGLA. The trust of the veterans, who the VAGLA and its personnel serve, is an essential element to properly treating the patients. It is not far fetched to conclude that patients will refuse treatment or disobey instructions from VAGLA personnel if they perceive the VAGLA to have endorsed the disrespecting and dishonoring of the United States flag.

Accordingly, the VAGLA had reasonable and legitimate justifications to enforce section 1.218(a)(9) in light of the purpose of the VAGLA Campus.

2. *Precluding Plaintiff from Hanging the American Flag with the Union Down Was Unconstitutional Viewpoint Discrimination.*

Defendants contend that the VAGLA did not restrict "Plaintiff's ability to convey his opinion" because Plaintiff is permitted to hold his protest in front of the Perimeter Fence. (Defs.' Mot. 6:1–3.) They also argue that the impetus to strictly enforce section 1.218(a)(9) was not a motivation to silence Plaintiff, but instead was a need to address the complaints by patients. (Defs.' Opp'n 5:2–7.)

a. *The VAGLA Properly Considered the Disruptions Flying the American Flag Upside Down Would Have Had on Its Mission to Provide Health Care for Veterans.*

Plaintiff vehemently argues that Defendants may not "discriminate[ ] between different kinds of speech on the basis of the listener reaction to that speech." (Pl.'s Opp'n 14:20–22; *see also* Pl.'s Reply 2:10–17.) Plaintiff contends that the VAGLA, by giving weight to the patient's negative reaction to his speech, did not have a neutral justification for restricting the speech. (Pl.'s Opp'n 14:20–22.) As support, Plaintiff cites to a number of Supreme Court and Ninth Circuit cases. (Pl.'s Mot. 13:18–22; Pl.'s Opp'n 14:22–28.)

Unfortunately, the cases offered by Plaintiff are inapposite. The cases generally relate to restriction of speech in public fora. In *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 127, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), a white supremacist group sought to march down public streets and conduct a rally in a public square. In *Center for Bio–Ethical Reform, Inc. v. Los Angeles*, anti-abortion activists displayed photographs of aborted fetuses on the public streets outside a middle school's campus. 533 F.3d 780, 784–86 (9th Cir.2008) ("Plaintiffs sought to express their anti-abortion message on a public street, a traditional public forum."). As Plaintiff acknowledges, the Perimeter Fence is neither a traditional public forum nor a designated public forum. (*See* Pl.'s Mot. 7:9–8:13.) This distinction makes all the difference. A more lenient standard applies when the Government seeks to restrict speech in a nonpublic forum like the VAGLA Campus's Perimeter Fence. *See Sammartano*, 303 F.3d at 965.

██ More importantly, both the Supreme Court and the Ninth Circuit have held that the Government may consider listeners' reactions, such as disruptions and controversies that the speech may create, when deciding whether to restrict speech in a nonpublic forum. *Cornelius*, 473 U.S. at 810, 105 S.Ct. 3439 ("[Courts cannot] ignore the teachings of … [the Supreme] Court that the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum."). The Supreme Court has held that the mere possibility of disruptions and controversies is sufficient justification to deny access to a nonpublic forum. *Perry Educ. Ass'n*, 460 U.S. at 52 n. 12, 103 S.Ct. 948 ("[T]here is no showing in the record of past disturbances … or evidence that future disturbance would be likely. We have not required that such proof be present to justify the denial of access to a non-public forum on grounds that the proposed use may disrupt the property's intended function."); *but see Norse v. City of Santa Cruz*, 629 F.3d 966, 979 (9th Cir.2010) ("Even in a limited public forum like a city council meeting, the First Amendment tightly constrains the government's power; speakers may be removed only if they are actually disruptive.") (Kozinski, J., concurring). The Supreme Court also has recognized that content-based restrictions by the Government may be reasonable in order to minimize "the appearance of favoritism, and the risk of imposing upon a captive audience." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). Following Supreme Court precedent and as noted above, the Ninth Circuit in *Preminger II*, 552 F.3d at 767, found no violation of the First Amendment when a VA medical center restricted speech after considering its patients' negative reaction to that speech. *See also DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 968 (9th Cir.1999) (affirming the constitutionality of a public entity's decision to exclude "con-

troversial topics" in light of the audience's maturity, the desire to disassociate itself from the speech, and the need to avoid the appearance of endorsing a specific view).

Accordingly, Plaintiff is mistaken when it asserts that Defendants may never give weight to the audience's negative reaction to speech in a nonpublic forum. The VAG-LA was constitutionally permitted to consider the disruptions and controversies that the hanging of the United States flag, union down, had caused and would have further caused.

### b. Section 1.218 Was Not Enforced in a Viewpoint Neutral Manner.

■ Though Defendants' consideration of how patients and visitors will react to Plaintiff's speech was reasonable, Defendants may have still violated the First Amendment if the exclusion of Plaintiff's speech was because of viewpoint discrimination. *See Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439 ("The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination."); *DiLoreto,* 196 F.3d at 969 ("Although the District's decision not to post [a religious] ad was reasonable ... it may still [have] violate[d] the First Amendment if it discriminate[d] on the basis of viewpoint, rather than content."). The Supreme Court has long held that the Government has the "right to make distinctions in access on the basis of subject matter and speaker identity," *Perry Educ. Ass'n,* 460 U.S. at 49, 103 S.Ct. 948, but "must not [make] distinctions] based on the speaker's viewpoint," *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 682, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). In cases where the Supreme Court and the Ninth Circuit have upheld the constitutionality of the Government's restriction of speech based on the audience's reaction, such exclusions

from nonpublic fora have been based on subject matter. *See, e.g., Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 683, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (solicitation); *Preminger II,* 552 F.3d at 767 (partisan groups and activities); *DiLoreto,* 196 F.3d at 969 (religion). Therefore, whether Defendants' enforcement of section 1.218(a)(9) was constitutional turns on whether the enforcement was viewpoint neutral. It was not.

### i. Plaintiff Conveyed a Different Viewpoint when He Hung the American Flag Upside Down.

Defendants insist that enforcing section 1.218(a)(9) when Plaintiff had hung the American flag, union down, was not viewpoint discrimination because Plaintiff expressed the same viewpoint when he hung the American flag, union up. (Defs.' Mot. 6:28–7:9.) In Defendants' minds, Plaintiff conveyed in both circumstances his disagreement with the VAGLA's refusal to develop the Great Lawn for the shelter and care of veterans. (Defs.' Mot. 7:1–7.) The Court is not persuaded.

Plaintiff's motivation for hanging the flag in different positions may have been the same, but the messages conveyed were markedly different. When Plaintiff first hung the United States flag, right-side up, he "was expressing the message that ... almost everyone perceives when they see the flag displayed that way—a message of patriotism." (Rosebrock Decl. ¶ 9.) He sought to make a statement "that whatever [his] disagreement with the VA, [he and the protestors] were proud and patriotic Americans." (*Id.*) Defendants mount no opposition to Plaintiff's argument that the act of displaying the American flag in its traditional position is an expression of reverence and loyalty to our collective identity as a nation. No binding case law acknowl-

edging this obvious fact is needed, but there are many from the highest court in the land. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 405, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("Pregnant with expressive content, the flag as readily signifies this Nation as does the combination of letters found in 'America.'"); *Smith v. Goguen,* 415 U.S. 566, 603, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (Rehnquist, J., dissenting) ("[The American flag] is not merely cloth dyed red, white, and blue, but also the one visible manifestation of two hundred years of nationhood—a history compiled by generations of our forebears and contributed to by streams of imigrants [sic] from the four corners of the globe...."); *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 632–33, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("Causes and nations ... seek to knit the loyalty of their following to a flag....").

Plaintiff's expression of patriotism stands in stark contrast to his subsequent "signal of dire distress ... [and] of extreme danger to life or property." 4 U.S.C. § 8(a); *see also The Laura,* 81 U.S. 336, 337, 14 Wall. 336, 20 L.Ed. 813 (1871) (A captain of a ship "ordered the flag to be raised Union down" because he had "extreme anxiety for the safety of all on board."). The message Plaintiff intended to show when he hung the American flag with the union down was "not to express [his] patriotism or support for military veterans." (Rosebrock Decl. ¶ 15.) Rather, he hoped to send a clear message that "the VA was endangering the land and ... in so doing, VA officials were endangering the veterans." (*Id.*) An inverted flag signifies "what the flag's [aforementioned] powerful message does not encompass ...:

dissent." *Brown v. Cal. Dep't of Transp.,* 321 F.3d 1217, 1224 (9th Cir.2003). Case law from other district courts supports this conclusion. *See Roe v. Milligan,* 479 F.Supp.2d 995, 998–99 n. 2 (S.D.Iowa 2007) (recognizing that "[a]n inverted flag ... by law is considered a signal of dire distress" and that the plaintiffs displayed the flag as a form of protest). In fact, Defendants acknowledge the distinction between Plaintiff's expressive acts. Even if "[t]he only distinction ... by the varied position of the flag is Plaintiff's own personal frustration," that frustration nonetheless created two different viewpoints, two divergent messages: one of fidelity to country and another of fierce dissent.

Lastly, Defendants assume that symbols may only carry one viewpoint or one message. "Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind." *Barnette,* 319 U.S. at 632, 63 S.Ct. 1178. "Such adornments have multiple meanings, including but not limited to conveying allegiance to a particular institution or a broad band of convictions, values, and beliefs." *Berner v. Delahanty,* 129 F.3d 20, 29 (1st Cir.1997). Here, Plaintiff placed multiple meanings into the display of the American flag. When he hung the flag, union up, he was expressing: (1) his disagreement with the VAGLA's land use policy; and (2) his patriotism. When he hung the flag inverted, however, he was exhibiting: (1) his opposition to the VAGLA's land use policy; but also (2) "a signal of dire distress"; and (3) a modicum of disrespect to the American flag.[6] Simply

---

6. The Court fully concedes that Plaintiff previously declared "[he] did not intend to demonstrate disrespect to the flag." (Decl. of Robert Rosebrock in Supp. of Pl.'s Prelim. Inj. ¶ 8.) Yet, there can be no doubt that Plaintiff

was fully cognizant of the symbolism behind his decision to display the flag with the union down and how other people may interpret such a drastic act. Indeed, Carrier informed Plaintiff of how disrespectful the act of dis-

because Plaintiff's motivation, or perhaps one viewpoint, overlapped does not mean that the two opposing displays of the United States flag expressed the same viewpoints. *See Barnette*, 319 U.S. at 632–33, 63 S.Ct. 1178 ("A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn."). And undoubtedly, it was the difference in viewpoints that disturbed Defendants and spurred them to selectively enforce section 1.218(a)(9). It is nonsensical to conclude that the contents of Plaintiff's expressive acts were one and the same; because if that were so, then patients and visitors would not have complained (*see* Carrier Decl. ¶ 12), nor would the VA police have reacted so manifestly different.

Accordingly, the Court finds that Plaintiff conveyed differing viewpoints when he displayed the American flag properly and when he hung the flag inverted.

### ii. Plaintiff's Speech Was Excluded Because of His Viewpoint, Not the Subject Matter.

The Court must next determine whether Plaintiff's speech was excluded from the Perimeter Fence because of viewpoint or subject matter. As previously mentioned, restriction based on the former category is impermissible, while the latter is not. *See Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 280 (9th Cir.1997) ("The government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, so long as the restriction is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.") (quotations omitted). Therefore, even if the display of the American flag in various positions represented different viewpoints, the exclusion of the inverted flag would not violate the First Amendment if it were based on subject matter.

Defendants fail to argue that the exclusion of Plaintiff's speech was based on subject matter rather than viewpoint. (*See generally* Defs.' Mot.; Defs.' Opp'n; Defs.' Reply.) The Court independently questions if Defendants' enforcement of section 1.218(a)(9) against the display of the American flag, union down, may be characterized as a restriction based on subject matter jurisdiction. The Court does so out of respect for the gravity of the constitutional claim asserted and the ramifications the claim may have on all parties involved.

■ "[I]t must be acknowledged, the distinction [between viewpoint and subject matter] is not a precise one." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). The "distinction is one between 'subject matter' (content) and 'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered' (viewpoint)." *PMG Int'l Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1171 (9th Cir.2002). "The test is whether the government has excluded perspectives on a subject matter otherwise permitted by the forum." *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 912 (9th Cir.2007) *abrogated on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 375, 172 L.Ed.2d 249 (2008). Often, "the level at which 'subject matter' is defined can control whether discrimination is held to be on the basis of content or viewpoint." *Giebel v. Sylvester*, 244 F.3d 1182, 1188 n. 10 (9th Cir.2001).

For the case at hand, the subject matter may properly be characterized as either postings or commentary on the VAGLA's

playing the American flag inverted is. (*See* Rosebrock Decl. ¶ 17.)

land use policy. Applying either of these broad subject matters, it is evident that Defendants permitted certain viewpoints included in the subject matters, while they disallowed others. The VA police granted Plaintiff permission to hang the United States flag and the P.O.W. flag, but not other forms of postings. (*See* Webb Dep. 53:18–19, 67:4–15.) In the alternative, the VA police allowed Plaintiff to express disagreement cloaked in a patriotic symbol, but not strong dissent through a signal of dire distress. Therefore, Defendants' selective enforcement was "an effort to suppress the [Plaintiff]'s activity due to disagreement with ... [his] view," *Lee*, 505 U.S. at 679, 112 S.Ct. 2701, not because of an evenhanded exclusion of a subject matter.

The Court finds *Brown v. California Department of Transportation*, 321 F.3d at 1223–24, instructive and directly on point. In *Brown*, the Ninth Circuit held that the defendant agency's selective enforcement of its permit policy constituted impermissible viewpoint discrimination. *Id.* at 1224. The permit policy forbade individuals from displaying any messages on highway overpasses, which the appellate court determined to be "nonpublic fora." *Id.* at 1222. The defendant agency did not prohibit the display of American flags, nor required a permit for their display. *Id.* at 1220. When the plaintiffs hung an anti-war banner on a highway overpass, police officers "immediately removed the banner" because it supposedly posed a safety threat to drivers. *Id.* The Court of Appeals held that "the flag's powerful message does not encompass, for many ... exactly that which [the plaintiffs] voice[d]: dissent." *Id.* at 1224. By excluding the plaintiffs' message of dissent, but allowing others to express their loyalty and patriotism for our great nation, the defendant agency had curtailed the plaintiffs' freedom of speech. *See id.*

Here, section 1.218(a)(9) precludes any unauthorized speaker from posting any material on the Perimeter Fence. Yet, Defendants permitted Plaintiff to display the United States flag like the defendant agency did in *Brown*, 321 F.3d at 1220. Defendants then selectively excluded a viewpoint that could not have been encompassed by the United States flag hung with the union up. The Court is not persuaded by Defendants' argument that the VA police did not strictly enforce section 1.218 against Plaintiff and the protestors because they feared harsh enforcement tactics against elderly veterans would be misconstrued by the public. (Defs.' Reply 4:1–5:10.) The Court acknowledges the undisputed record shows that Plaintiff and fellow protestors, in many instances, sought to antagonize the VA police and to publicize their encounters. (Cameron–Banks Decl. Exs. 9–11.) Nonetheless, the record also shows that Plaintiff and his fellow demonstrators were very cooperative with VA police when told that they could not hang any postings other than the P.O.W. flag and the American flag with the union up. (Webb Dep. 53:22–23; Rosebrock Decl. ¶ 10.) Consistently, agents of Defendants "either explicitly or implicitly" authorized Plaintiff to convey one viewpoint, but denied him any opportunity to convey another. (Defs.' Reply 4:3–4.) Pursuant to Ninth Circuit precedent, Defendants' prohibition of the display of the inverted American flag, while permitting the display of it with the union up, constituted viewpoint discrimination.

E. *Defendants May Close the Perimeter Fence from All Forms of Speech, Thereby, Mooting Plaintiff's Request for a Permanent Injunction.*

Defendants claim that Plaintiff's request for a permanent injunction is moot because

the VA police have been enforcing section 1.218 uniformly and the directive from Carrier unequivocally prohibits selective enforcement against Plaintiff's speech. (Defs.' Mot. 7:21–9:4.) Citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), Plaintiff argues that Defendants' "voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." (Pl.'s Reply 4:12–24.) Plaintiff also asserts that the change in the policy resulted only because of this litigation and that nothing prevents Defendants from enforcing section 1.218(a)(9) in an uneven manner. (*Id.* at 4:15–19.) In addition, Plaintiff states that "Defendants' vigorous defense of the legality of their actions shows that [Plaintiff]'s equitable claims are [not] moot." (*Id.* at 4:22–24.)[7]

■ The parties, however, miss an important point: the VAGLA is constitutionally permitted to close the Perimeter Fence as a forum for all future speech. Because Defendants have closed the forum, Plaintiff's request for equitable relief is moot. *See, e.g., Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1031–32 (9th Cir.2006) (deeming moot a challenge to a street banner ordi-

nance because an amendment precluded all private parties from the forum).

■ In *DiLoreto v. Downey Unified School District Board of Education*, 196 F.3d at 970, the Ninth Circuit made clear in no uncertain terms that "[t]he government has an inherent right to control its property, which includes the right to close a previously open forum." *See also Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948 ("[A] State is not required to indefinitely retain the open character of the [designated public forum] . . . ."); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 571 (9th Cir.1984) ("[T]he City was not required to open the [forum] and is not required to leave it open indefinitely . . . ."). The Court of Appeals held that "[c]losing the forum is a constitutionally permissible solution to the dilemma caused by concerns about providing equal access . . . [to a nonpublic forum]." *DiLoreto*, 196 F.3d at 970. Thus, when the school district in *DiLoreto* closed an advertising space on a school's baseball field fence rather than post a religious advertisement, the Ninth Circuit found no constitutional violation. *Id.* at 970. Subsequent Ninth Circuit case law has reaffirmed that the Government "may close the [designated or limited public] fora whenever it wants." *Currier v. Potter*, 379 F.3d 716, 728 (9th Cir.2004),

---

7. Plaintiff's arguments are unpersuasive. First, *Friends of the Earth, Inc.*, 528 U.S. at 174, 120 S.Ct. 693, is inapposite because the case did not involve First Amendment rights and the decision did not analyze whether the Government may close a forum, as is the case here. Ninth Circuit case law clearly establishes that the Government, as a property owner and manager, has the right to close a previously opened forum from speech. Were the Court to find *Friends of the Earth, Inc.* applicable, the Court would still find Plaintiff's request for equitable relief moot. Though Plaintiff provides an accurate statement from *Friends of the Earth, Inc.*, Plaintiff ignores the Supreme Court's pronouncement in that very same decision that "[a] case

might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 170, 120 S.Ct. 693. Defendants carry their burden of persuading the Court that the VAGLA will apply section 1.218(a)(9) evenhandedly. Second, whether a change of policy is impelled by litigation is not relevant as to the issue of mootness. *See White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) (where litigation "was the catalyst for the agency's adoption of a new policy"). Third, the directive is "broad in scope and unequivocal in tone," which supports Defendants' assertion that the policy change is permanent. *See id.*

*cert. denied sub nom. Seattle Hous. & Res. Effort v. Potter,* 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 866 (2005).

 Moreover, "[a]n injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono,* —— U.S. ——, 130 S.Ct. 1803, 1816, 176 L.Ed.2d 634 (2010). "[A] court must never ignore significant changes in the law or circumstances underlying an injunction [request] lest the [sought after] decree be turned into an 'instrument of wrong.'" 11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2961 (2d ed. 1995) (quoting *United States v. Swift & Co.,* 286 U.S. 106, 115, 52 S.Ct. 460, 76 L.Ed. 999 (1932)). As such, the Supreme Court has held that a district court commits an "error" when it does not acknowledge "substantial change in circumstances bearing on the propriety of [a] requested [equitable] relief." *Salazar,* 130 S.Ct. at 1816.

Here, as in *DiLoreto,* 196 F.3d at 970, Defendants closed the nonpublic forum, the Perimeter Fence, from any postings. All private individuals are precluded from hanging the P.O.W. flag and the American flag, with the union up or down. Previously, the VA police had an unwritten policy of permitting the display of the P.O.W. flag and the American flag, union up, on the Perimeter Fence. (Webb Dep. 57:4–11.) On June 30, 2010, Carrier issued a directive to the VA police department that VA police officers must enforce section 1.218 "precisely and consistently." (Carrier Decl. Ex. 8.) Carrier expressly mandated that no flags in any position be displayed, thereby closing the Perimeter Fence to all speech. (*See id.*) Pursuant to Ninth Circuit law, the closing of the Perimeter Fence to all postings was constitutional and made Plaintiff's request for equitable relief unviable. In addition, the broad and unequivocal directive from Carrier represents a "substantial change in circumstances" that bear on the appropriateness of Plaintiff's request.

Accordingly, Plaintiff's request for equitable relief is moot because Defendants are constitutionally permitted to close the Perimeter Fence from any postings.

F. *The Court also Denies Plaintiff's Request for a Permanent Injunction Because Plaintiff Fails to Establish that Equitable Relief Is Appropriate.*

 In addition to the fact that Defendants have closed the Perimeter Fence as a forum for speech, Plaintiff's request for permanent injunction is untenable. He has not established that the balance of equities tips in his favor or that a permanent injunction is in the public interest.

 A plaintiff seeking a permanent injunction must establish that: (1) he actually succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Winter,* 129 S.Ct. at 374 (elements for preliminary injunction); *see also Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546, n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). "While a First Amendment claim 'certainly raises the specter' of irreparable harm and public interest considerations," proving the success on the merits "is not enough." *See Dish Network Corp. v. FCC,* 636 F.3d 1139, 1144 (9th Cir.2011); *see also Paramount Land Co. v. Cal. Pistachio Comm'n,* 491 F.3d 1003, 1012 (9th

Cir.2007) ("But simply raising a serious claim is not enough to tip the hardship scales."). To obtain a permanent injunction, a plaintiff "must also demonstrate that he is likely to suffer irreparable injury in the absence of a [permanent] injunction, and that the balance of equities and the public interest tip in his favor." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir.2009); *see also Winter*, 129 S.Ct. at 381 ("The factors examined above—the balance of equities and consideration of the public interest—are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent.").

### 1. The Balance of Equities Does Not Tip in Plaintiff's Favor.

The Court is tasked with the difficult responsibility of weighing the infringement of Plaintiff's First Amendment right, on one hand, against the probable disruptions to complex, life sustaining medical and psychological services for veterans, on the other hand. Plaintiff contends that the balance of equities tips in his favor because the protection of his First Amendment right "is not merely a benefit to [him] but to all citizens." (Pl.'s Mot. 17:7–9.) In addition, Plaintiff seemingly argues that the balance of equities tips in his favor automatically following his success on the merits. (*Id.* at 17:11–13 ("the balance-of-hardship requirement[ ] is satisfied where First Amendment protections are at issue").) Defendants are silent on whether Plaintiff has established that a permanent injunction is warranted. (*See generally* Defs.' Mot.; Defs.' Opp'n; Defs.' Reply.)

■ In contrast to Plaintiff's assertion, the Supreme Court has held that a permanent injunction "does not follow from success on the merits as a matter of course." *Winter*, 129 S.Ct. at 381. In fact, "it would be an abuse of discretion to enter a permanent injunction" without the Court first examining the balance of equities between Plaintiff and Defendants. *See id.* Plaintiff also misconstrues the balance of hardship requirement as between the public and the VAGLA. (*See* Pl.'s Mot. 17:7–9.) In doing so, Plaintiff is confusing the public interest requirement with the balance of equities requirement. *See Sammartano*, 303 F.3d at 974 ("The public interest inquiry primarily addresses impact on nonparties rather than parties."). The Court "look[s] at [the public interest] factor separately, not simply as part of the balancing of hardships." *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931 (9th Cir.2003). Were Plaintiff's request for a permanent injunction granted, the injunction would only allow Plaintiff to display the American flag inverted on the Perimeter Fence, not other members of the public. *Compare* (Pl.'s Mot. 17:9–10) *with Int'l Soc'y for Krishna Consciousness v. Kearnes*, 454 F.Supp. 116, 125 (E.D.Cal.1978) (where a city ordinance relating to solicitations affected all residents, not just the plaintiff). Thus, the proper analysis is the weighing of hardships between Plaintiff and the VAGLA.

After careful thought and review of the record, the Court finds that the balance of hardships does not tip in Plaintiff's favor. First, Plaintiff has been able to exercise his First Amendment right through the exhibition of the American flag, union down, in "other forums available for displaying Plaintiff's message." *See Seattle Mideast Awareness Campaign v. King Cnty.*, 771 F.Supp.2d 1266, 1278, 2011 WL 649488, at *11 (W.D.Wash.2011) (considering the availability of other fora in analyzing the elements outlined in *Winter*, 129 S.Ct. at 374). Plaintiff admits that Defendants never prevented him from holding the American flag inverted. (*See* Rosebrock Decl. ¶ 24; Cameron–Banks Decl. Ex. 10.) Plaintiff was, and continues to be,

able to convey his disagreement with the VAGLA's land use policy, provide a signal of great distress, and showcase disrespect of the American flag within 50 feet of the Perimeter Fence for all the world to witness. (Rosebrock Decl. ¶ 24.) Thus, Plaintiff's "inability to demonstrate freely on [the Perimeter Fence] is not a hardship.... [He] may demonstrate in a designated area adjacent to [the Perimeter Fence] in full view of any motorist" or pedestrian who traverses the intersection of San Vicente and Wilshire Boulevards. *See Hale v. Dep't of Energy,* 806 F.2d 910, 918 (9th Cir.1986) (finding the balance of hardships did not favor the plaintiff). Plaintiff fails to realize that "[t]he First Amendment does not guarantee an optimal setting for speech at all times and places." *Id.* Second, the irreparable harm that the permanent injunction will cause to the VAGLA's mission and the medical care it provides is severe. Plaintiff prays the Court to grant him permission to display the American flag inverted for 66 weeks without regard to the havoc that such a decision may have on the VAGLA's mission and the veterans it serves. (Pl.'s Mot. 20:20–21.) As stated above, perceptions that the VAGLA endorses such disrespect for the American flag will likely "violat[e] the trust of [the] patients." *See Preminger II,* 552 F.3d at 767. That trust is integral for the VAGLA to care for our brothers, sisters, sons, and daughters who have sacrificed immeasurably for our country. Credibility, once lost, is not easily regained, if at all. Without that trust, veterans who are patients may very well question the VAGLA's instructions, diagnoses, and prescriptions; Defendants' ability to provide proper health care will be jeopardized. Further, the VAGLA and Defendants are obligated to care for those who have risked life and limb for this country. *See* 38 U.S.C. § 301. They are also knowledgeable and experienced in providing for complex medical and psychological care, expertise that the Court lacks. Thus, when Defendants state that granting Plaintiff's request would hamper their mission to provide quality health care to veterans, some deference should be given to that assessment.

Furthermore, granting Plaintiff's request for a permanent injunction would divert limited resources away from the caring of veterans to the supervising and enforcing of the injunction. Security threats have already arisen on at least two separate occasions. (Carrier Decl. ¶ 12.) Defendants would have to commit time and money to ensure that Plaintiff's American flag, union down, is not disturbed by third parties and that Plaintiff is not physically attacked on the VAGLA Campus.

The hardships on Defendants will be far-reaching and likely irreparable, and therefore, the balance of equities weighs against granting of Plaintiff's request for equitable relief. Accordingly, Plaintiff's request for a permanent injunction is unjustifiable.

### 2. A Permanent Injunction Is Not in the Public Interest.

Plaintiff's request for equitable relief is also inappropriate because the permanent injunction will not serve the public interest. Plaintiff asserts that "[u]pholding the First Amendment and ensuring that the government respects the fundamental principle of viewpoint neutrality is in the public interest." (Pl.'s Mot. 17:15–18:13.) Defendants do not address the issue. (*See generally* Defs.' Mot.; Defs.' Opp'n; Defs.' Reply.)

[17–20] The Ninth Circuit has instructed that "[i]n cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Sammartano,* 303 F.3d at 965 (edit in original); *see also Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102

S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). The public interest is involved when "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir.2009). "In considering the public interest, [the Court] may [also] consider the hardship to all individuals . . . not limited to parties, as well as the indirect hardship to their friends and family members. . . ." *Golden Gate Rest. Ass'n v. City of San Francisco*, 512 F.3d 1112, 1126 (9th Cir.2008). As with the balance of equities factor, it is an abuse of discretion for a court to enter a permanent injunction without consideration of the public interest. *See Winter*, 129 S.Ct. at 381; *Stormans, Inc.*, 586 F.3d at 1140 ("The district court clearly erred by failing to consider the public interest at stake."). A plaintiff bears the initial burden of showing that the injunction is in the public interest. *See Winter*, 129 S.Ct. at 374.

Plaintiff is correct that courts "consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano*, 303 F.3d at 974. Nonetheless, "[t]he public interest in maintaining a free exchange of ideas, though great, has in some cases been found to be overcome by a strong showing of other competing public interests, especially where the First Amendment activities of the public are only limited, rather than entirely eliminated." *Id.* Such was the case in *Preminger I*, 422 F.3d at 826, where the Ninth Circuit held that the public interest did not require an injunction because: (1) "the VA ha[d] a competing public interest in providing the best possible care . . . for the veterans seeking services from the [VA medical center]"; and (2) "because other means [were] available

for [the plaintiffs to conduct their First Amendment activities]." Other courts have similarly held that "the public interest is . . . served by maintaining uninterrupted medical care and continuity of care for wounded veterans, service members, and their families." *See, e.g., Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 551 (2010); *IDEA Int'l, Inc. v. United States*, 74 Fed.Cl. 129, 143 (2006) ("The interests of the military families bear repeating as part of the public interest."); *PGBA, LLC v. United States*, 60 Fed.Cl. 196, 221 (2004) (holding that the public interest is served through medical services for veterans and families of service members).

The public interest does not require entry of a permanent injunction. Here, as in *Preminger I*, 422 F.3d at 826, the countervailing interest is "the public interest in providing the best possible care . . . for the veterans seeking services from the [VAGLA] Campus." *See also Stormans, Inc.*, 586 F.3d at 1139 ("The general public has an interest in the health of state residents.") (quotations omitted). Also similar to *Preminger I*, Plaintiff has other means to convey his signal of great distress. Plaintiff may display the American flag inverted on the public sidewalk approximately 50 feet away from the Perimeter Fence. (*See* Rosebrock Decl. ¶ 24; Cameron–Banks Decl. Ex. 10.) Plaintiff is able to reach the same audience with the same message. Lastly, the tremendous hardships to the veterans, their family members, and visitors to the VAGLA Campus weigh against finding that a permanent injunction is in the public interest. *See Golden Gate Rest. Ass'n*, 512 F.3d at 1126. When Plaintiff's speech disrupts services or diverts resources away from veterans, family members and visitors are also harmed. Because of these compelling reasons, Plaintiff fails to meet his burden of showing that the permanent injunction is in the public interest. *See City of Harri-*

*sonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 338, 53 S.Ct. 602, 77 L.Ed. 1208 (1933) ("Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling."). Accordingly, Plaintiff has not established that his request for a permanent injunction is in the public interest.

In sum, Plaintiff has established that his First Amendment right was violated as a matter of law when Defendants committed impermissible viewpoint discrimination. The granting of Plaintiff's request for a permanent injunction does not, however, follow as a matter of course. Plaintiff's conviction to shine light on the plight of homeless veterans is undoubtedly laudable. In his zealous quest to right a perceived wrong, Plaintiff may in fact cause greater harm to the very community he seeks to serve. He desires to turn an equitable remedy into an instrument of wrong. Plaintiff's request for a permanent injunction to allow him to display the United States flag with the union down on the Perimeter Fence is indefensible and DENIED.

## IV. *RULING*

For the foregoing reasons, Plaintiff's and Defendants' Motions for Summary Judgment are **GRANTED IN PART AND DENIED IN PART.** As a matter of law, Defendants violated Plaintiff's First Amendment right by practicing viewpoint discrimination through selective enforcement of 38 C.F.R. section 1.218. Plaintiff's request for a permanent injunction, however, is **DENIED** because his request is moot and he has not met his burden to show that such equitable relief is appropriate.

IT IS SO ORDERED.