**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT ROSEBROCK,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>RONALD MATHIS, Chief of Police of The Veterans Administration Greater Los Angeles Healthcare System, in his official capacity; DONNA BEITER, Director of The Veterans Administration Greater Los Angeles Healthcare System, in her official capacity,<br>*Defendants-Appellees*. | No. 11-56256<br><br>D.C. No.<br>2:10-cv-01878-SJO-SS<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
April 8, 2013—Pasadena, California

Filed March 14, 2014

Before: Ferdinand F. Fernandez, Johnnie B. Rawlinson,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Rawlinson

## SUMMARY[*]

### Mootness

The panel affirmed the district court's denial of plaintiff's request for injunctive relief after determining that the request was moot due to the Department of Veterans Affairs' recommitment to consistently enforce an existing regulation, 38 C.F.R. § 1.218, which prohibited the posting of materials on Veterans Affairs property except when authorized by the head of the Veterans Affairs facility in question or a designee of that individual, or when the posting of materials is part of authorized Government activities.

Plaintiff alleged that defendants failed to enforce the regulation when he and his fellow protestors hung the American flag union up on a fence surrounding VA property, but enforced the regulation when the protestors hung the American flag union down on the fence. The panel determined that, based on the record, this inconsistent enforcement stopped when an associate director of the VA Greater Los Angeles Healthcare System sent an e-mail to the VA police instructing them to consistently enforce the prohibition in the regulation.

The panel agreed with the district court that the Government's voluntary cessation of its inconsistent enforcement of § 1.218(a)(9) mooted the request for injunctive relief. The panel held that the Government satisfied its heavy burden of demonstrating mootness.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Presuming that the Government acts in good faith, the panel determined that the presumption was especially strong in this case, where the Government was merely recommitting to consistent enforcement of one of its own longstanding regulations.

Dissenting, Judge Rawlinson stated that defendants failed to establish that the new policy regarding enforcement was the kind of permanent change that proved voluntary cessation sufficient to moot plaintiff's claim for injunctive relief. She stated that the e-mail sent by the associate director was not protective of First Amendment rights, did not address the objectionable actions described in plaintiff's claim for injunctive relief, and was not publicly disseminated in such a way as to bind defendants in the future.

## COUNSEL

Peter J. Eliasberg (argued), Hector O. Villagra and Jessica G. Price, ACLU Foundation of Southern California, Los Angeles, California, for Plaintiff-Appellant.

Indira J. Cameron-Banks (argued), Assistant United States Attorney, United States Department of Justice, Los Angeles, California; André Birotte Jr., United States Attorney, and Leon W. Weidman, Assistant United States Attorney (Chief of the Civil Division), United States Department of Justice, Los Angeles, California, for Defendants-Appellants.

**OPINION**

BYBEE, Circuit Judge:

Since 1973, a regulation promulgated by the Department of Veterans Affairs (VA), 38 C.F.R. § 1.218, has prohibited the posting of materials on VA property except when authorized by the head of the VA facility in question or a designee of that individual, or when the posting of materials is part of authorized Government activities. *See* 38 C.F.R. § 1.218(a)(9); *see also* Security, Law Enforcement, and Standards of Conduct on Veterans Administration Property, 38 Fed. Reg. 24,364, 24,365 (Sept. 7, 1973) (to be codified at 38 C.F.R. pt. 1). This case arises from the inconsistent enforcement of § 1.218 as applied to Robert Rosebrock.

Rosebrock is a veteran who objects to the failure of the VA to use a lawn outside of the Los Angeles Campus (LA Campus) of the VA Greater Los Angeles Healthcare System (VAGLA) for the benefit of veterans, and particularly homeless veterans. Since March 2008, Rosebrock and a group of like-minded veterans have protested weekly outside of the locked fence that surrounds the LA Campus lawn to draw public attention to the VA's failure to use the lawn for veterans. Although neither VAGLA nor the VA has ever had a general policy of inconsistent enforcement of the prohibition on posting materials in § 1.218, VAGLA and its police force inconsistently enforced the regulation in response to these protests. In particular, over a period of at least eight months, VAGLA and its police failed to enforce the regulation when Rosebrock and his fellow protestors hung the American flag union up on the fence surrounding the LA Campus lawn, but enforced the regulation when the protestors hung the American flag union down on the fence. Based on

the record before us, this inconsistent enforcement stopped on June 30, 2010, when a VAGLA associate director sent an e-mail to the VAGLA police instructing them to consistently enforce the prohibition in the regulation.

While the inconsistent enforcement was ongoing, Rosebrock filed a complaint in the United States District Court for the Central District of California, bringing a cause of action under the First Amendment, and seeking declaratory and injunctive relief. The district court ultimately granted summary judgment to Rosebrock with regard to declaratory relief, holding that the VA defendants violated Rosebrock's First Amendment rights by engaging in viewpoint discrimination, but the district court denied Rosebrock any injunctive relief. *Rosebrock v. Beiter*, 788 F. Supp. 2d 1127, 1140–49 (C.D. Cal. 2011). One of the rationales given by the district court for denying injunctive relief was that the request for injunctive relief had been mooted by the June 30, 2010 e-mail instructing the VAGLA police to enforce § 1.218 consistently. *Id.* at 1143–45.

Before us now is Rosebrock's appeal from the district court's denial of injunctive relief. We agree with the district court that Rosebrock's requests for injunctive relief are moot, and thus we affirm.

I

Pursuant to its authority to "make all needful rules and regulations for the governing of the property under [the Secretary of Veterans Affairs'] charge and control" under the National Cemeteries Act of 1973, Pub. L. No. 93-43, § 4, 87 Stat. 75, 79 (codified as amended at 38 U.S.C. § 901), the VA promulgated 38 C.F.R. § 1.218 in 1973. *See* Security,

Law Enforcement, and Standards of Conduct on Veterans Administration Property, 38 Fed. Reg. at 24,364–65. This subsection has not materially changed in the nearly forty years since its promulgation. *Compare* Security, Law Enforcement, and Standards of Conduct on Veterans Administration Property, 38 Fed. Reg. at 24,365 (subsection (i)), *with* 38 C.F.R. § 1.218(a)(9). Today's version reads as follows:

> Distribution of handbills. The distributing of materials such as pamphlets, handbills, and/or flyers, and the displaying of placards or posting of materials on bulletin boards or elsewhere on property is prohibited, except as authorized by the head of the facility or designee or when such distributions or displays are conducted as part of authorized Government activities.

38 C.F.R. § 1.218(a)(9). According to a declaration from the VAGLA police chief who is a defendant in this suit, VAGLA policy has always been strict enforcement of the prohibition on posting in § 1.218(a)(9). There is no evidence in the record suggesting that VAGLA or the VA has ever had a general policy of inconsistent enforcement. Accordingly, this case arises not from the regulation itself, or from a general VAGLA or VA policy with regard to its enforcement, but rather from inconsistent enforcement of the regulation by VAGLA and its police officers on the ground in this particular case.

## II

VAGLA is one of the largest and most complex VA healthcare systems in the country. The LA Campus is the only VAGLA location in the Los Angeles region where complex medical, surgical, and psychiatric care is offered. Rosebrock and other veterans protest for three to four hours each Sunday outside of the locked fence that surrounds the LA Campus lawn to draw public attention to the VA's failure to use the lawn for veterans. During these protests, which began on March 9, 2008, Rosebrock initially hung the American flag union up on the fence, along with a POW/MIA banner. Sometimes, Rosebrock would also hang a Vietnam unit flag and a "Support Our Troops" banner on the fence. When Rosebrock hung the American flag union up, he intended to express patriotism, and a message of honor and support for the U.S. military. VAGLA police had informed Rosebrock that the posting of materials on the LA Campus fence was prohibited by federal regulations, but, in spite of the broad prohibition in § 1.218(a)(9), they had also informed him, incorrectly, that there was an exception covering the American flag and POW/MIA banner.[1]

VAGLA police and staff did not confront Rosebrock about hanging the Vietnam unit flag and "Support Our Troops" banner—neither of which was covered by the stated exception—until November 30, 2008, when a VAGLA police sergeant asked Rosebrock to remove them. Consistent with the stated exception, the VAGLA police sergeant told

---

[1] Nothing in the record suggests that any of the VAGLA police officers involved were "designees" of the head of the LA Campus who could authorize Rosebrock to hang the American flag or POW/MIA banner under § 1.218(a)(9).

Rosebrock that the union-up American flag and POW/MIA banner, which were right next to the flag and banner that had to be removed, could remain on the fence. For the seven months following this confrontation, Rosebrock continued to hang the union-up American flag and the POW/MIA banner on the fence, and the VAGLA police did not interfere. According to VAGLA, VAGLA and its police refrained from citing Rosebrock to avoid confrontation with demonstrators, which VAGLA feared could escalate the fervor of the protests. VAGLA and its police, many of whom were veterans themselves, were also reluctant because many of the demonstrators were elderly veterans.

Rosebrock grew increasingly upset with the situation involving the lawn, and, as a result, beginning on June 14, 2009, he started to hang the American flag union down rather than union up. In hanging the flag union down, Rosebrock meant to convey an entirely different message than the message he had intended to convey by hanging the flag union up. Specifically, the union-down flag was intended to convey a "distress call" regarding the VA's use of land that, in Rosebrock's opinion, rightfully should be used for veterans.[2]

A week after he first hung the flag union down, VAGLA police approached Rosebrock and ordered him to hang the flag union up or remove it, and Rosebrock complied by removing the flag. Shortly thereafter, on June 26, 2009, Rosebrock received an e-mail from a VAGLA associate director saying that he could "not attach the American flag,

---

[2] Under 4 U.S.C. § 8, which is intended to guarantee that the American flag is treated with respect, "[t]he flag should never be displayed with the union down, except as a signal of dire distress in instances of extreme danger to life or property." 4 U.S.C. § 8(a).

upside down, anywhere on VA property including [the] perimeter gates," and that doing so "is considered a desecration of the flag and is not allowed on VA property." This e-mail did not authorize Rosebrock to post any materials on VA property.[3]

On July 24, 2009, a VAGLA police patrol captain sent an e-mail to VAGLA police officers instructing them to issue citations to Rosebrock under § 1.218(a)(9) if they observed him hanging any signs or flags on the fence. According to VAGLA, it began taking action once Rosebrock began hanging the flag union down, because VAGLA received complaints from patients who were upset at seeing the union-down flag and Rosebrock himself complained that he had been threatened by individuals offended at the display. Believing that the VA was attempting to impermissibly restrict his speech, Rosebrock continued to hang the flag union down during his Sunday protests. Between July 2009 and September 2009, a period during which Rosebrock hung the American flag only union down on the fence, Rosebrock received six citations in the mail pursuant to § 1.218(a)(9). Four of the citations explicitly mentioned that the flag was hung union down. Presumably, the VAGLA police officers who had previously felt uncomfortable confronting Rosebrock felt less uncomfortable now that they were confronting him for hanging the flag union down, a sign of disrespect to our flag and country or a signal of immediate distress, and now that Rosebrock's actions had led to

---

[3] Because this e-mail merely told Rosebrock that he could not post certain materials on VA property, and did not authorize Rosebrock to post any other materials, we do not view this as evidence of a general VAGLA policy of inconsistent enforcement of § 1.218(a)(9).

complaints from patients and threats to Rosebrock's safety.**4**
All of the citations were dismissed at the request of an
Assistant United States Attorney.

In February 2010, Rosebrock prominently hung American
flags union up on the fence with VAGLA police nearby, but
they did not interfere with Rosebrock's display or cite him.
That same month, after Rosebrock had not hung the
American flag union down on the fence for some time to
avoid being cited, Rosebrock hung the flag union down again
and was told by the VAGLA police to remove the flag and his
POW/MIA banner from the fence. When Rosebrock refused,
the VAGLA police removed the flag and banner.

In sum, based on the record before us, for at least eight
months after Rosebrock began sometimes hanging the flag
union down on the fence, and even after a VAGLA police
patrol captain told VAGLA police officers to cite Rosebrock
under § 1.218(a)(9) if he hung any sign or flag on the fence,
VA representatives only cited Rosebrock or interfered with
his activity if he hung the flag union down.**5**

---

**4** Though the decision by VAGLA to refrain from enforcing § 1.218
against Rosebrock until he began hanging the flag union down
demonstrates that VAGLA elected to enforce its regulation inconsistently
in this instance, VAGLA's actions in this particular case do not
demonstrate that VAGLA's general policy was inconsistent enforcement.
As we say elsewhere in this opinion, the only evidence regarding
VAGLA's general policy suggests that the policy has been strict
enforcement of the prohibition on posting in § 1.218.

**5** The dissent argues that 38 C.F.R. § 1.218(a)(9), by its plain terms, may
not "even apply to Mr. Rosebrock's act of hanging the American flag"
because Rosebrock did not distribute anything and a "flag" differs from
a "pamphlet" "flyer" or "handbill." Dissent at 26–27. We agree that the
words of a governing text are a paramount concern, but unlike the dissent,

In March 2010, Rosebrock filed a complaint in the United States District Court for the Central District of California, bringing a cause of action under the First Amendment, and seeking declaratory and injunctive relief. Rosebrock filed a motion seeking a preliminary injunction against the VAGLA police that would prevent them from citing him for hanging the American flag union down on the LA Campus fence. The district court denied the motion, and we affirmed in an unpublished decision. *See Rosebrock v. Mathis*, 400 F. App'x 261 (9th Cir. 2010).

On June 30, 2010, the VAGLA associate director who had previously sent Rosebrock the e-mail about hanging the flag union down sent an e-mail directive to the VAGLA police, which said the following:

> I would like to confirm my office's previous instructions to you and your department. Please ensure that VA Regulation 38 CFR 1.218 is enforced precisely and consistently.

---

we consider the whole text and give effect to every word therein. *Int'l Ass'n of Machinists & Aerospece Workers v. BF Goodrich Aerospace Aerostructure Group*, 387 F.3d 1048, 1051 (9th Cir. 2004) ("[i]n analyzing a statutory text, we do not look at its words in isolation."); *In re Cervantes*, 219 F.3d 955, 961 (9th Cir. 2000) ("[w]e have consistently . . . reject[ed] interpretations that would render a statutory provision . . . a nullity"). Here, § 1.218(a)(9) prohibits individuals from distributing written materials, *and* it prohibits "displaying of placards or posting of materials on bulletin boards or elsewhere on property." *See, e.g.*, *Webster's II New Riverside University Dictionary* 388, 918 (describing display as "[t]o put forth for viewing : EXHIBIT" and post as "[to put up (an announcement) in a place of public view.") So, even though Rosebrock did not distribute written materials, § 1.218(a)(9) still applies because he "displayed" and "posted" "materials"—including various flags and banners—on the VAGLA's property .

> As we discussed, this means that NO outside
> pamphlets, handbills, flyers, flags or banners,
> or other similar materials may be posted
> anywhere on VA Property (including the
> outside fence/gates). This includes any flags
> displayed in any position. Further, the
> regulation only extends to VA Property.
> Therefore, it does NOT include the public
> sidewalk outside of VA Property.
> Accordingly, protests and/or demonstrations
> (including flags in any position) that take
> place off VA Property (on the public
> sidewalk) should not be interfered with. Also,
> please make sure that this information is
> disseminated to all officers who patrol the VA
> grounds and to the rest of your department. If
> you have any questions or concerns, please
> contact me. Thanks.

In a declaration, the VAGLA police patrol captain who sent the July 2009 e-mail to VAGLA police officers about Rosebrock said it was her understanding that the VAGLA police have been strictly enforcing § 1.218(a)(9) since the associate director's June 30, 2010 e-mail.

A few months after the June 30, 2010 e-mail, the parties filed cross-motions for summary judgment with regard to declaratory relief and permanent injunctive relief. In his motion for summary judgment, Rosebrock sought two forms of injunctive relief: (1) a "preventive injunction" forbidding the defendants from committing viewpoint discrimination against Rosebrock going forward, and (2) a "reparative injunction" requiring the defendants to allow Rosebrock to hang the American flag union down on the LA Campus fence

for 66 weeks—the amount of time, according to Rosebrock, that VA officials allowed Rosebrock to hang the flag union up on the fence without interference.

The district court granted summary judgment to Rosebrock with regard to declaratory relief, holding that the VA defendants violated Rosebrock's First Amendment rights by engaging in viewpoint discrimination, *Rosebrock*, 788 F. Supp. 2d at 1140–43, but denied Rosebrock any injunctive relief, *id.* at 1143–49. The district court denied injunctive relief on two independent bases: first, it held that the request for a permanent injunction was mooted by the VAGLA associate director's June 30, 2010 e-mail closing the fence to all forms of speech, *id.* at 1143–45; and second, it held that a permanent injunction was not appropriate because the balance of equities did not tip in Rosebrock's favor and a permanent injunction would not be in the public's interest, *id.* at 1145–49.[6] The district court entered a declaratory judgment in favor of Rosebrock on his First Amendment claim.

---

[6] Rosebrock points out that the district court's order was not clear as to whether both grounds for its decision—mootness, and the appropriateness of permanent injunctive relief—applied to both requests for injunctive relief. He reads the district court's order as denying the preventive injunction based on mootness and denying the reparative injunction on the merits. We disagree with Rosebrock's reading of the district court's order. Nothing in the order suggests that the mootness analysis was limited to the request for a preventive injunction. Because we agree with the district court that Rosebrock's requests for both types of injunctive relief are moot, we need not reach the merits of the requests, and thus we need not comment on the district court's consideration of the merits.

Rosebrock timely appealed, and seeks the two types of permanent injunctive relief denied him by the district court.[7]

### III

The district court held that the June 30, 2010 e-mail instructing the VAGLA police force to enforce § 1.218(a)(9) precisely and consistently mooted Rosebrock's request for a permanent injunction by closing the LA Campus fence as a forum for all speech. That is, the district court held that the Government's voluntary cessation of its inconsistent enforcement of § 1.218(a)(9) mooted the request for injunctive relief. We agree with the district court.[8]

### A

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a

---

[7] The defendants did not appeal the summary judgment against them with respect to Rosebrock's request for declaratory relief, so we need not consider the district court's holding with regard to viewpoint discrimination.

[8] We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's mootness determination de novo. *Smith v. Univ. of Wash., Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000). Factual determinations underlying the district court's mootness determination are reviewed for clear error. *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010).

resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (internal quotation marks omitted)). But voluntary cessation can yield mootness if a "stringent" standard is met: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189. The party asserting mootness bears a "heavy burden" in meeting this standard. *Id.*

We presume that a government entity is acting in good faith when it changes its policy, *see Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010), but when the Government asserts mootness based on such a change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again. *White v. Lee*, 227 F.3d 1214, 1243–44 (9th Cir. 2000); *see also Bell v. City of Boise*, 709 F.3d 890, 898–99 & n.13 (9th Cir. 2013).

"[A] case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the [offending] provision." *Coral Constr. Co. v. King County*, 941 F.2d 910, 928 (9th Cir. 1991). "A statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." *Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 878 (9th Cir. 2006). By contrast, "repeal or amendment of an ordinance by a local government

or agency does not necessarily deprive a federal court of its power to determine the legality of the practice" at issue, *Bell*, 709 F.3d at 899 (internal quotation marks omitted), though it may do so in certain circumstances, *see Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1031–32 (9th Cir. 2006) (holding that amendments to city ordinances had rendered facial challenges to those ordinances moot). Particularly relevant to this case, a policy change not reflected in statutory changes or even in changes in ordinances or regulations will not necessarily render a case moot, *see, e.g.*, *Bell*, 709 F.3d at 899–901, but it may do so in certain circumstances, *see, e.g.*, *White*, 227 F.3d at 1242–44.[9]

---

[9] The dissent argues this case is more like *Bell* than *White* because the policy change in *Bell*, like the recommitment to the regulation here, "'could be easily abandoned or altered in the future.'" Dissent at 24–25 (quoting *Bell*, 709 F.3d at 900–01). The dissent also argues that this case differs from *White* because the policy change here prohibited expressive activity, whereas the permanent policy change in *White* protected First Amendment rights. Dissent at 27.

The comparison to *Bell* is flawed. The plaintiff there challenged an ordinance that criminalized sleeping in public, and the Government argued the claim was moot because the Chief of Police issued a Special Order that prohibited law enforcement from enforcing the ordinance under certain circumstances. 709 F.3d at 893–95. But the Special Order could not repeal the ordinance. The ordinance remained in effect, so law enforcement could have legally enforced the ordinance after Plaintiff Bell's case was dismissed. By contrast, here, there is no issue with the established law, and the goal is for VAGLA police to enforce the law as they should have been doing all along. In other words, the goal is following the law as written, whereas in *Bell* the officers were instructed *not* to follow the law under poorly defined circumstances.

Further, the policy change here is substantially similar to the change in *White*. There, a high-ranking official issued a memorandum that addressed problematic Government conduct and instructed them about First Amendment concerns related to an already-existing law. 227 F.3d

We have not set forth a definitive test for determining whether a voluntary cessation of this last type—one not reflected in statutory changes or even in changes in ordinances or regulations—has rendered a case moot. But we have indicated that mootness is more likely if (1) the policy change is evidenced by language that is "broad in scope and unequivocal in tone," *Id.* at 1243; (2) the policy change fully "addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case", *id.*; (3) "th[e] case [in question] was the catalyst for the agency's adoption of the new policy," *id.*; (4) the policy has been in place for a long time when we consider mootness, *see id.* at 1243–44 & nn. 25, 27; and (5) "since [the policy's] implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff[ ]," *id.* at 1243.**[10]** On the other hand, we are less inclined to find mootness where the "new policy . . . could be easily abandoned or altered in the future." *Bell*, 709 F.3d at 901. Ultimately, the question remains whether the party asserting mootness "has met its heavy burden of proving that the challenged conduct cannot reasonably be expected to recur." *White*, 227 F.3d at 1244.

---

at 1243. Here, the associate director's e-mail resolves the conduct that harmed Rosebrock because the message instructed officers to apply the existing regulation consistently, so as to avoid content-based discrimination. Further, like the memorandum in *White*, *id.* at 1242, the e-mail emphasized the importance of First Amendment rights: " protests and/or demonstrations . . . that take place off VA Property . . . should not be interfered with." In this situation, the associate director could not have done anything more to trumpet the superiority of the Constitution. After all, she could not legally encourage First Amendment activity on VAGLA's property that would violate 38 C.F.R. § 1.218(a)(9).

**[10]** We emphasize that the considerations discussed here do not provide an exhaustive or definitive list.

B

In this case, the VA action in question—the June 30, 2010 e-mail—did not effect a policy change in the typical sense because 38 C.F.R. § 1.218 has been in place, virtually unchanged, for nearly forty years, and the only evidence in the record addressing VAGLA's or the VA's policy regarding enforcement of the regulation suggests that VAGLA's policy has been consistent enforcement. The June 30 e-mail seems more aptly described as reemphasizing, or recommitting to, an existing policy. In fact, by its own terms, the e-mail "confirm[ed] . . . previous instructions" to the VAGLA police. Of course, in a world of limited resources, such a reemphasis or recommitment can always be fairly characterized as a policy change, but we do not think this a distinction without a difference. In fact, we see this distinction as cutting both ways.

On the one hand, this distinction highlights that this was really a problem of enforcement, and problems of enforcement may persist in spite of an announced recommitment to a policy. If VAGLA and its police allowed its regulation to be violated in the past without any response, the announced recommitment to a policy may not prevent similar decisions from being made in the future. Similarly, if VAGLA and the veterans on the VAGLA police force were not comfortable interfering with elderly veterans' proper display of the American flag before, perhaps that will not change even if the brass has announced a recommitment to consistent enforcement. On the other hand, the concern with policy changes that are not cemented by statute or some other inertial form—that the purported change in policy may be gamesmanship—is not present here. Inconsistent enforcement of § 1.218(a)(9) was never general VAGLA or

VA policy in the first place, and VAGLA's recommitment to strict enforcement makes it particularly unlikely that VAGLA will change its policy in the future.

On balance, we find the latter point more compelling. We have little concern that the VA is engaged in gamesmanship where, as here, the VA states that it will be more vigilant in following a previously existing policy of consistent enforcement of a longstanding regulation. Our confidence in the Government's voluntary cessation, *see Am. Cargo Transp.*, 625 F.3d at 1180, is at an apex in this context. The fact that the Government's "voluntary cessation" is more aptly described as reemphasizing, or recommitting to, an existing policy of consistent enforcement of a longstanding regulation—not as a policy change—increases our confidence that "the challenged conduct cannot reasonably be expected to recur." *White*, 227 F.3d at 1244. Nonetheless, the considerations we have previously emphasized in cases involving policy changes not embodied in statutes or otherwise procedurally protected are instructive here, so we proceed to examine this case within that loose framework.

## C

All of the factors that suggest mootness in "policy change" cases are present here. First, the June 30, 2010 e-mail was a clear statement, broad in scope, and unequivocal in tone. *See id.* at 1243. The e-mail insisted that § 1.218 be "enforced precisely and consistently," emphasizing that this directive meant that "NO outside pamphlets, handbills, flyers, flags or banners, or other similar materials may be posted anywhere on VA Property." The e-mail also asked its recipients to "make sure that [the directive would be]

disseminated to all officers who patrol the VA grounds and to the rest of [their] department."

Second, the e-mail fully "addresse[d] all of the objectionable measures that [the Government] officials took against the plaintiff[ ] in this case." *See id.* With the fence effectively closed as a forum for speech, the VA cannot engage in viewpoint discrimination with regard to the speech allowed in this forum.[11]

Third, although the record does not demonstrate definitively that Rosebrock's case was the "catalyst" for VAGLA's recommitment to strict enforcement of § 1.218, *see id.*, the record strongly suggests that this is so. In particular, the e-mail was sent shortly after Rosebrock filed his suit, and it mentions "flags in any position," "flags displayed in any position," and the "outside fence/gates,"— seemingly references to Rosebrock's case.

Fourth, at this point, the VA's recommitment to strict enforcement of its longstanding regulation occurred a fairly

---

[11] Rosebrock contends that the discretion allowed to the "head of the facility or designee" under § 1.218(a)(9) to authorize displays on VA property prevents the e-mail from mooting his request for permanent injunctive relief. But there is no evidence in the record suggesting that the head of the LA Campus or any designee will use this discretion to commit viewpoint discrimination now that VAGLA has recommitted to strict enforcement of the prohibition in § 1.218. Especially in light of the fact that VAGLA's general policy has never been inconsistent enforcement, and in light of the faith we place in the Government, *see Am. Cargo Transp.*, 625 F.3d at 1179–80, we do not take the June 30, 2010 e-mail as a cagy recommitment to strict enforcement of a regulation made with the knowledge that the discretion afforded by the regulation will serve as a loophole allowing ongoing viewpoint discrimination through inconsistent enforcement.

long time ago.  *See id.* at 1243–44 & nn. 25, 27.  The VAGLA associate director sent the e-mail on June 30, 2010, more than three years ago.

Finally, based on the record before us, "since [the recommitment] the agency's officials have not engaged in conduct similar to that challenged by the plaintiffs."  *See id.* at 1243.

## D

We recognize that there are no procedural safeguards in place preventing VAGLA from changing course, a factor that countenances against mootness.  *See Bell*, 709 F.3d at 900–01.  But there is little reason to doubt VAGLA's recommitment to a preexisting policy in favor of consistently enforcing a longstanding regulation.  Moreover, in light of the presumption that the Government acts in good faith, we have previously found the heavy burden of demonstrating mootness to be satisfied in "policy change" cases without even discussing procedural safeguards or the ease of changing course. *See, e.g.*, *Am. Cargo Transp.*, 625 F.3d at 1179–80.

In the end, we hold that the VA has satisfied its heavy burden of demonstrating mootness.  We presume that the Government acts in good faith, and that presumption is especially strong here, where the Government is merely recommitting to consistent enforcement of one of its own longstanding regulations.  In light of this and the other considerations outlined above, we do not think it reasonably likely that the objectionable conduct will recur.  If it does, Rosebrock is well-armed with his declaratory judgment and can pursue relief in a new suit.

IV

Rosebrock's requests for injunctive relief were properly dismissed as moot. The judgment of the district court is **AFFIRMED**.

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the majority's conclusion that Mr. Rosebrock's First Amendment claim for injunctive relief has been rendered moot by an e-mail "instructing" the Veteran Affairs Greater Los Angeles Healthcare System [VAGLA] police "to consistently enforce" the regulation governing posting of materials. *Majority Opinion*, p. 4–5.

As the majority opinion acknowledges, voluntary cessation of challenged conduct renders a case moot only if the party asserting mootness meets the "heavy burden" of establishing that "subsequent events [have] made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Majority Opinion*, p. 15 (quoting *Friends of the Earth Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189) (emphasis added).

The majority opinion also concedes that when the government asserts mootness as a result of a change in policy, it is unlikely to prevail if the "government is otherwise unconstrained should it later desire to reenact the [offending] provision," or more accurately in this case, later desire to permit discriminatory enforcement. *Majority Opinion*, p. 15 (quoting *Coral Constr. Co. v. King Cnty*, 941 F.2d 910, 928 (9th Cir. 1991)) (alterations omitted). Indeed, the majority

and I agree that a determination of mootness is inappropriate if a newly adopted policy "could be easily abandoned or altered in the future." *Majority Opinion*, p. 17 (quoting *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013)). But we part company in our respective applications of these agreed upon principles. The majority is of the view that the Department of Veteran Affairs (VA) met its "heavy burden" and I am of the view that it did not.

From where I sit, the history of this case aligns more closely with *Bell* than it does with *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), the case most heavily relied upon by the majority for its substantive analysis. *See Majority Opinion*, pp. 19–21. In *White*, we concluded that federal officials from the Department of Housing and Urban Development (HUD) had met their "heavy burden" of establishing mootness due to a "permanent change" by HUD in the way investigations are conducted. *White*, 227 F.3d at 1244.

The plaintiffs in *White* brought an action against HUD officials, alleging that they were harassed and investigated solely because they exercised their rights under the First Amendment to protest against the conversion of a hotel into housing for homeless persons. *See id*. at 1220–21, 1225. As a direct result of the lawsuit filed by the Plaintiffs, the Assistant Secretary of HUD for Fair Housing and Equal Opportunity issued a memorandum entitled "Substantive and Procedural Limitations on Filing and Investigating Fair Housing Act Complaints That May Implicate the First Amendment." *Id*. at 1242. The memorandum was accompanied by a press release explaining that the plaintiffs' activities were protected by the First Amendment and that the guidelines set forth in the memorandum were developed in response to plaintiffs' protected activities. *See id*.

Importantly, the memorandum trumpeted the supremacy of First Amendment rights, stating that "where [Fair Housing Act] concerns intersect with First Amendment protections, HUD officials must defer to the latter:  the Department chooses to err on the side of the First Amendment."  *Id*. at 1243 (internal quotation marks omitted).  We concluded that this public, detailed, contrite and emphatic renunciation of its past policy represented "a permanent change" by HUD that mooted the plaintiff's request for injunctive relief.  *Id*. at 1243.

The facts of the case we decide today are closer to those we considered in *Bell*.  *Bell* involved a city ordinance that criminalized sleeping in a public or private structure or motor vehicle, without the permission of the owner.  *See* 709 F.3d at 893.  Plaintiffs filed an action pursuant to 42 U.S.C. § 1983 asserting that the ordinance "ha[d] the effect of criminalizing homelessness and constitutes cruel and unusual punishment . . ."  *Id*. (internal quotation marks omitted).  The district court determined that Plaintiffs' claims for prospective injunctive relief were mooted due to the issuance of a Special Order by the Chief of Police that prohibited enforcement of the ordinance "when a person is on public property and there is no available overnight shelter. . . ."  *Id*. at 895.

We contrasted the Special Order in *Bell* with the "entrenched and permanent policy issued in *White*. . . ."  *Id*. at 900 (citation omitted).  We noted that the new policy in *White* "was designed to *protect* the First Amendment rights of parties subject to HUD investigations . . ."  *Id*.  "[T]he new policy . . . was fully supportive of First Amendment rights, addressed all of the objectionable measures that HUD officials took against the plaintiffs, and . . . confessed that plaintiffs' case was the catalyst for the agency's adoption of

the new policy. . . ." *Id.* (quoting *White*, 227 F.3d at 1243 & n.25) (alterations and internal quotation marks omitted).

We distinguished the Special Order at issue in *Bell*, concluding that the Special Order "lack[ed] the assurances present in *White*." *Id.* We noted the significance of the new policy in *White* "address[ing] *all* of the objectionable measures that HUD officials took against the plaintiffs." *Id.* (citation and internal quotation marks omitted) (emphasis in the original). "In contrast, the Special Order fail[ed] to fully address Plaintiffs' allegations . . . Moreover, . . . the authority to establish policy . . . [was] vested entirely in the Chief of Police, such that the new policy regarding enforcement of the Ordinances could be easily abandoned or altered in the future." *Id.* at 900–01. We concluded: "Simply put, Defendants have failed to establish with the clarity present in *White* that the new policy is the kind of permanent change that proves voluntary cessation." *Id.* at 901.

The change in policy upon which the majority opinion relies is an e-mail from the associate director of VAGLA. *See Majority Opinion*, pp. 11–12. As noted in the majority opinion, the e-mail directed the VAGLA police to "ensure that VA Regulation 38 C.F.R. 1.218 is enforced precisely and consistently." *Id.*, p. 11.[1]

---

[1] 38 C.F.R. § 1.218(a)(9) provides in pertinent part:

> Distribution of handbills. The *distributing* of materials *such as pamphlets, handbills, and/or flyers*, and the displaying of *placards* or posting of materials on bulleting boards or elsewhere on property is prohibited,

As a preliminary matter, it could be convincingly argued that 38 C.F.R. 1.218(a)(9) does not even apply to Mr. Rosebrock's act of hanging the American flag. This portion of the regulation is directed by title toward the distribution of handbills, and its content prohibits *distributing* handbills and similar items such as pamphlets, flyers, and placards, all of which are written materials. *See, e.g.*, *Webster's Ninth New Collegiate Dictionary* 550, 849 (1984) (describing a handbill as "a small *printed* sheet" and a pamphlet as "an unbound *printed* publication") (emphases added).

It is an elementary principle of legislative interpretation that words of a feather flock together. *See In re W. States Wholesale Nat. Gas Antitust Litig.*, 715 F.3d 716, 734 n.13 (9th Cir. 2013) ("*Noscitur a sociis* means that a word is known by the company it keeps . . ." (citation and internal quotation marks omitted); *see also United States v. Kimsey*, 668 F.3d 691, 701 (9th Cir. 2012) (holding that statutory terms "grouped in a list should be given related meaning"and "[t]hat several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well") (citations omitted). One would be hard pressed to group "flag" with the other words included in the regulation provision. In fact, these words could readily be adapted to an elementary school vocabulary exercise:

---

except as authorized by the head of the facility or designee.

(Emphasis Added).

This is the provision that was enforced against Mr. Rosebrock.

**flyer        handbill        flag        pamphlet**

**Which of these words does not belong?**

This exercise underscores the likely inapplicability of the regulation provision to Mr. Rosebrock's conduct, especially when one considers that he was not actually distributing anything. And if the provision did not apply to Mr. Rosebrock's activities, the violation of this Vietnam Veteran's First Amendment rights would be even more egregious, and could not be mooted by an e-mail "ensuring" enforcement of an inapplicable regulation provision.

Even if the provision did apply to Mr. Rosebrock's activities, his claim for injunctive relief was not mooted by the referenced e-mail. In *White*, we relied on the fact that the formal memorandum (not e-mail) changing the policy was issued by the Assistant Secretary for the Department of Housing and Urban Development. *See White*, 227 F.3d at 1242. In this case, the e-mail (not formal memorandum) was authored by a local associate director. In *White*, the policy change protected First Amendment rights. *See id*. at 1243. Here, the e-mail prohibited all expressive activity. In *White*, the change in policy was publicized in the media, with positive remarks about the importance of First Amendment rights. *See id*. The e-mail in this case took great pains to squelch the exercise of First Amendment activity and was distributed only to the VAGLA police.

Like the Special Order in *Bell*, the e-mail in this case "lacks the assurances present in *White*." *Bell*, 709 F.3d at 900. The e-mail was not protective of First Amendment rights, did not address the objectionable actions described in Mr. Rosebrock's claim for injunctive relief, and was not

publicly disseminated in such a way as to bind VAGLA in the future. *See id*. As in *Bell*, "Defendants have failed to establish with the clarity present in *White* that the new policy is the kind of permanent change that proves voluntary cessation" sufficient to moot Mr. Rosebrock's claim for injunctive relief. *Id*. at 901.

It is beyond dispute that this Vietnam-era veteran has earned the right to exercise the full panoply of First Amendment protections available in this country. We should not whisk away those rights with the flick of a pen. I respectfully dissent.